IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SHOEMONEY MEDIA GROUP, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> KEYEN FARRELL and ) <br> JOHN J. FARRELL, ) <br> ) <br> Defendants. ) <br> ) | 8:09CV131 <br><br> ORDER |

This matter is before the court on plaintiff's combined Motion to Extend Deadline for Responding to Defendants' Motion to Dismiss, and Motion for Leave to Conduct Jurisdictional Discovery (Doc. 12). The matter has been fully briefed.

### I. BACKGROUND

Plaintiff filed this action in state court alleging, *inter alia*, that the defendants violated the Lanham Act, 15 U.S.C. §§ 1114 & 1125 by using its name and trademark, i.e., "Shoemoney," in the text of their sponsored internet links to divert plaintiff's customers to the defendants' web site. Defendants timely removed the matter to federal court and filed a motion to dismiss (Doc. 9) pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.

### A. Defendants' Evidence

The defendants submitted their affidavits (Doc. 11) in support of the pending motion to dismiss. Keyan Farrell resides in the State of New York and his father, John J. Farrell,

resides in the State of Connecticut.  Neither Keyen Farrell nor John J. Farrell have ever resided in Nebraska, visited Nebraska, owned real property, owned a business, or maintained an office, employees, contractors, officers, directors, agents or volunteers in the State of Nebraska.  Keyen Farrell states that the only contact he has had with Nebraska residents has been on the internet.

Keyan Farrell has been employed as an Account Coordinator for Google, Inc. in New York City since September 17, 2007.  On or about January 22, 2009, Keyen Farrell opened a Google "AdWords" account under the name John J. Farrell, with his father's permission and financial sponsorship.  The AdWords account was opened for the purpose of advertising www.myincentivewebsite.com (herein, "MYINCENTIVE"), a web site run by Keyan Farrell.

According to both defendants, Google has a policy that it does not allow advertisers to use a registered trademark in the text of sponsored links.  When a keyword is submitted for an "AdWords" account, the keyword is run through the Google system.  If the keyword is a registered trademark, the Google system is supposed to prevent the trademark from appearing in the text of the ad.

Defendants both state that they relied upon Google's internal review mechanism in setting up Keyan Farrell's AdWords account, but the internal review process failed to prevent the term "shoemoney" from appearing in the text of the ads associated with the AdWords account.  They did not learn of the "Shoemoney" trademark until March 31, 2009, when Keyan Farrell received a cease and desist letter from plaintiff's counsel.  That same day, Keyan Farrell changed the AdWords account so that the term "shoemoney" is no longer a keyword on that account.

Keyan Farrell's affidavit states that on April 14, 2009, he used Google Analytics to determine the number of "AdWords" visits to his MYINCENTIVE web site that were a result of the use of the term "shoemoney," to determine how many of the visits originated from the State of Nebraska, how many of the Nebraska visits resulted in a sale, and how many times Nebraska residents had used or visited the MYINCENTIVE web site.

According to Keyan Farrell, the Google Analytics utility reported a total of 11 AdWords visits from Nebraska that were a result of the term "shoemoney."  No sales resulted from those visits.  One hundred eighty (180) of the 85,256 "AdWords" visits to the MYINCENTIVE web site were from Nebraska.  Two hundred (200) of the 90,033 total number of visits to the MYINCENTIVE web site were from Nebraska.  There have been 675 sales on the MYINCENTIVE web site.  Of these, three sales were from Nebraska and none of the sales originated from the use of the term "shoemoney."  The total revenue generated from the three Nebraska sales was $61.

### B. Plaintiff's Evidence

In reply, defendants have submitted the declarations of Jeremy Schoemaker (Doc. 16 at pp. 3-11/47) and Aaron Baker (Doc. 16 at pp. 31-36/47).

Mr. Schoemaker states that he founded the plaintiff corporation, ShoeMoney Media Group, Inc., in 2005.  Its primary web sites are located at www.shoemoney.com and www.shoemoneymedia.com.  Each web site contains prominent notices that Schoemaker and ShoeMoney Media Group are located in Nebraska.  ShoeMoney Media Group provides advice and tools to assist third parties in making money on the internet and running profitable internet businesses.

Schoemaker registered the Shoemoney trademark in 2007 because third parties were using the mark, without Schoemaker's permission, in the text of their ads placed through the Google Adwords program. According to Schoemaker, Google prohibits persons from using registered trademarks in the text of ads purchased through Google Adwords, but Google requires trademark owners to notify Google of the existence of the trademark before it will prevent others from using the trademarked term.

In the fall of 2007, Schoemaker notified Google that ShoeMoney Media Group had registered the "Shoemoney" trademark. Google acknowledged the registration on November 1, 2007 and, pursuant to its policy, prevented third parties from using the "Shoemoney" trademark in the text of their ads placed through Adwords.

Schoemaker learned that someone was using the "Shoemoney" mark to promote their own web site at www.myincentivewebsite.com. He sought to locate the name and contact information for the person operating that web site, but the web site was registered using a privacy masking system which prevented the general public from learning the identity of the persons who owned the web site. The registration information for MYINCENTIVE listed e-mail addresses for the technical and administrative contacts for the site. On February 24, 2009, Schoemaker sent an e-mail to those addresses advising the recipients that "Shoemoney" was a registered trademark. He demanded that the recipients immediately cease and desist all further use of the mark in advertising their competing web site, MYINCENTIVE. Schoemaker's signature on that message included his Nebraska mailing address.

Schoemaker did not receive a response to the February 24, 2009 e-mail. He visited the MYINCENTIVE web site and navigated to a contact screen allowing him to send a

message to the owner/operator of the site. Using this form, Schoemaker sent another message advising that "Shoemoney" was a registered trademark and demanding that they cease and desist further use of the trademark. His Nebraska address was included in the communication.

While investigating the use of the "Shoemoney" trademark on the MYINCENTIVE web site, Schoemaker determined that the domain registrar for the web site was a company called "namezero." According to Schoemaker, Keyen Farrell had paid an additional fee to namezero so he could register the account with a privacy setting that would not allow the general public to learn his identity and contact information. Schoemaker attempted to obtain his identity and contact information from Lunar Pages (the web host for MYINCENTIVE), but Lunar Pages would not release the information without a subpoena. In March 2009, Schoemaker's attorneys obtained an order from the Douglas County District Court authorizing the issuance of a subpoena and ordering Lunar Pages to respond to the subpoena. Lunar Pages then informed Schoemaker that Keyan Farrell was the owner/operator of the MYINCENTIVE web site.

Mr. Schoemaker advises that Keyen Farrell responded on April 1, 2009 to the cease and desist letter from plaintiff's counsel. Farrell's response stated that he began using the "Shoemoney" keywords on January 30, 2009. He provided four screen shots from his Google AdWords account.[1] Mr. Schoemaker states that the screen shots provided by Keyen Farrell on April 1, 2009 demonstrate that the defendants specifically chose to market their ads and their web site to Nebraska residents.

---

[1]Keyen Farrell's response and the four screen shots are attached to the Declaration of Patrick S. Cooper, Doc. 16 at pp. 41-47/47.

Schoemaker states that he has operated his own account through Google AdWords for several years. When a person establishes a new AdWords ad, Google specifically asks the person the geographical area where the advertiser wants the ad to appear. If the United States is selected as the location for an ad to be displayed, Google provides the advertiser with a list of each state within the United States and asks the advertiser which states or areas, if any, the advertiser wants to exclude from its advertising market; the advertiser is forced to make a conscious decision regarding the states within which it wishes to do business.

If allowed to conduct jurisdictional discovery, Schoemaker would request the logs for Keyan Farrell's AdWord account from Google in order to analyze whether there were more advertisements using the "Shoemoney" trademark that target Nebraska residents. The logs would also show whether the defendants selected the "Shoemoney" mark and the variations of that mark, or whether Google suggested the terms to them.

Schoemaker also takes issue with the defendants' statements that they never heard of ShoeMoney Media Group or the Shoemoney trademark prior to March 31, 2009. Google's records of all of the IP addresses from which the defendants' AdWords account was accessed could be cross-checked against logs of visitors to www.shoemoney.com to determine whether the defendants visited that site or www.shoemoneymedia.com prior to March 31, 2009. Records of the IP addresses from which the defendants accessed the internet in the past several years could also be used to determine if and when the defendants had visited Schoemaker's web sites.

Schoemaker's declaration states that defendants' MYINCENTIVE web site indicates that customers are charged $17 for each purchase on that web site. For that reason, it is unclear how the defendants reached the $61 total for the three Nebraska sales.

The defendants' MYINCENTIVE web site represents that they have operated incentive web sites for over five years. They have posted tax forms from 2004 and 2005 indicating they earned over $313,000 in 2004 and $289,000 in 2005 using these sites. Their affidavits, however, are silent as to whether they had other contacts with Nebraska in conjunction with their ongoing operation of incentive web sites.

Finally, Schoemaker has provided an article published in Colby Magazine in Spring 2005 featuring Keyen Farrell's success making money on the internet. Farrell stated in the article that his web site at that time generated 3,000 sales/transactions per month; however, the defendants' affidavits do not discuss the number of contacts they had with Nebraska residents through those web sites.

Aaron Baker states that he is the Executive Vice President of Global Sales for Atrinsic, Inc. Atrinsic is a digital advertising and entertainment network. Baker previously worked at Pepperjam Search, a search engine marketing company that, among other things, manages pay-per click (PPC) campaigns. PPC is an internet advertising model used on search engines where advertisers pay their host only when their advertisement is clicked on. Advertisers are charged a fixed price per click based upon the amount they bid for the keywords that caused their advertisements to appear. Google AdWords is a PPC search engine with which Baker is familiar. Google's terms of service prohibit its AdWords advertisers from using a third party's trademarked terms in the text of their advertisements.

According to Baker, Jeremy Schoemaker and ShoeMoneyMedia Group are well known in the online marketing industry.  Pursuant to Google's policy, ShoeMoney Media Group is the only person who may use the term "Shoemoney" in the text of advertisements placed through Google AdWords.  If unauthorized persons attempt to use "Shoemoney" in the text of their ads, Google will warn them that their proposed advertisements are contrary to Google's policy, and Google will not permit the trademarked term to appear in the advertisement unless an exception is granted.

Based on his "extensive" experience with the Google AdWords program, Baker opines that the Farrells would have been warned by Google that "Shoemoney" was a trademarked term when they first created the advertisements through Google AdWords and chose to use "Shoemoney" in the text of their ads.  The Farrells' affidavits do not state whether they received a trademark warning.  The screen shots provided by Keyen Farrell show that the Farrells' AdWords account included four specific ad groups that were manually titled "Tier2_Shoe money."  Each of the four ad groups contained six terms related to the Shoemoney brand:  Shoemoney, shoemoney.com, wwwshoemoney, www.shoemoney.com, and www.shoemoney.  To set up the AdWords account in this manner, the Farrells would have had to make a conscious decision to have the Shoemoney-related terms appear in the text of their advertisements, and someone would have had to manually set up the "Shoemoney" ad groups, as there is no automated system that could have created the specific ad groups for the "Shoemoney" terms.

Baker's declaration explains why it would be advantageous to select the term "Shoemoney" to market their MYINCENTIVE web site.  A minimal amount of research regarding Shoemoney would direct persons to Schoemaker's web sites, both of which

contain prominent notices that ShoeMoney Media Group and Jeremy Schoemaker are located in Nebraska.

## LEGAL ANALYSIS

Plaintiff seeks leave to conduct jurisdictional discovery before responding to the defendants' pending motion to dismiss for lack of personal jurisdiction. "The party asserting jurisdiction bears the burden of establishing a prima facie case.... To survive a motion to dismiss, the plaintiff must state sufficient facts in the complaint to support a reasonable inference that defendants may be subjected to jurisdiction in the forum state." *Steinbuch v. Cutler*, 518 F.3d 580, 585 (8th Cir.), *cert. denied*, 129 S. Ct. 223 (2008). *See also Lakin v. Prudential Securities, Inc.*, 348 F.3d 704, 706 n.3 (8th Cir. 2002). "If the court does not conduct an evidentiary hearing on the issue of jurisdiction, but instead relies upon the pleadings and affidavits, it views the facts in the light most favorable to the party opposing the motion." *Centurion Wireless Tech., Inc. v. Hop-on Communications, Inc.*, 342 F. Supp. 2d 832, 835 (D. Neb. 2004).

"In a federal question case, where the defendant resides outside the forum state, federal courts apply the forum state's personal jurisdiction rules if the applicable federal statute does not provide for national service of process." *Sunward Electronics, Inc., v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004). The Lanham Act does not provide for national service of process; therefore, the Nebraska state long-arm statute governs this inquiry. *See id.* (citing 15 U.S.C. § 1051, *et seq.* & Fed. R. Civ. P. 4(k)(1)(A)).

Nebraska's long-arm statute, Neb. Rev. Stat. § 25-536,[2] "has been interpreted to extend jurisdiction over nonresident defendants to the fullest degree allowed by the Due Process Clause of the United States Constitution. *Wagner v. Unicord Corp.,* 247 Neb. 217, 221, 526 N.W.2d 74, 77 (1995). Thus, constitutional limits will dictate whether jurisdiction over Defendant is proper." *Gray v. Lewis & Clark Expeditions, Inc.*, 12 F. Supp. 2d 993, 995-96 (D. Neb. 1998). In other words, (1) the defendant's activity must fall within the scope of the state long-arm statute, and (2) the exercise of jurisdiction under the state statute cannot violate federal due process standards of "fair play and substantial justice." *Centurion Wireless*, 342 F. Supp. 2d at 835.

There are two types of jurisdiction that satisfy the requirements of the Due Process Clause. Jurisdiction over a suit that arises out of the defendant's activities in the forum state is called "specific jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n.8 (1984).

> A state may exercise general jurisdiction if a defendant has carried on in the forum state a continuous and systematic, even if limited, part of its general business; in such circumstances the alleged injury need not have any connection with the forum state. *Keeton v. Hustler Magazine, Inc.*, 465 U.S.

---

[2]Neb. Rev. Stat. § 25-536 provides:

A court may exercise personal jurisdiction over a person:
  (1) Who acts directly or by an agent, as to a cause of action arising from the person:
      (a) Transacting any business in this state;
      (b) Contracting to supply services or things in this state;
      (c) Causing tortious injury by an act or omission in this state;
      (d) Causing tortious injury in this state by an act or omission outside this state if the person regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state;
      (e) Having an interest in, using, or possessing real property in this state; or
      (f) Contracting to insure any person, property, or risk located within this state at the time of contracting; or
  (2) Who has any other contact with or maintains any other relation to this state to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States.

> 770, 779 (1984). The plaintiff must make a prima facie showing, however, that the defendant's contacts were not "random," "fortuitous," or "attenuated." *Id.* at 774. Specific jurisdiction on the other hand is appropriate only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

*Steinbuch*, 518 F.3d at 586.

To evaluate the sufficiency of a defendant's contacts, the court must consider (1) the nature and quality of the defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interests of the forum state in providing a forum for its residents; and (5) the convenience of the parties. The first three factors are afforded primary importance. The third factor–the relation of the cause of action to the contacts–applies only in the specific jurisdiction context and is immaterial in a general jurisdictional inquiry. *Steinbuch*, 518 F.3d at 586.

> Courts have recognized that facts which would establish personal jurisdiction over the defendant are often in the exclusive control of the defendant. *See, e.g., Compagnie des Bauxites* [*de Guinee v. L'Union*, 723 F.2d 357, 362 (3d Cir. 1983)]. As such, a plaintiff may be unable, without some discovery, to properly respond to a motion to dismiss pursuant to 12(b)(2), and a court will therefore allow some discovery. *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 n.13, 98 S. Ct. 2380, 2389 n.13, 57 L. Ed. 2d 253 (1977) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues."); *Fraley v. Chesapeake & Ohio Ry. Co.,* 397 F.2d 1, 3 (3d Cir. 1968) (district court's refusal to permit discovery in aid of personal jurisdiction improper). On the other hand, a court cannot permit discovery as a matter of course simply because a plaintiff has named a particular party as a defendant.

*Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 475 (D. Del. 1995). Thus, the federal district court, in its discretion, may require a defendant to respond to discovery requests relevant to the defendant's motion to dismiss for lack of personal jurisdiction. *See*

*Andersen v. Sportmart, Inc.*, 179 F.R.D. 236, 241 (N.D. Ind. 1998); *Lakin v. Prudential Securities, Inc.*, 348 F.3d 704, 713 (8th Cir. 2003); *Steinbuch*, 518 F.3d at 588-89 (applying abuse of discretion standard).

> A plaintiff is entitled to jurisdictional discovery if he or she can show that the factual record is at least ambiguous or unclear on the jurisdiction issue.... This standard is quite low, but a plaintiff's discovery request will nevertheless be denied if it is only based upon "bare," "attenuated," or "unsupported" assertions of personal jurisdiction, or when a plaintiff's claim appears to be "clearly frivolous."

*Andersen v. Sportmart, Inc.*, 179 F.R.D. at 241-42.

In this instance, the evidence filed by the plaintiff rebuts that filed by the defendants and demonstrates a need to supplement the record regarding the defendants' contacts with the State of Nebraska so that the court can properly evaluate the factors identified by the Eighth Circuit in *Steinbuch*, i.e., the quantity of such contacts and the relation of plaintiff's causes of action to the contacts. Considering the nature of the parties' business activities, the court is particularly persuaded that the plaintiff should be permitted to conduct jurisdictional discovery to establish whether the exercise of general personal jurisdiction would be justified in this instance.

**IT IS ORDERED** that plaintiff's combined Motion to Extend Deadline for Responding to Defendants' Motion to Dismiss, and Motion for Leave to Conduct Jurisdictional Discovery (Doc. 12) is granted, as follows:

1. Plaintiff is given leave to conduct jurisdictional discovery. Counsel are ordered to confer in good faith and propose a joint discovery plan or stipulation to the court, no later than **June 1, 2009**, covering the topics and methods of discovery described at pages 12-14 of the plaintiff's reply brief (Doc. 15).

    2.  Plaintiff's deadline to respond to defendants' pending Motion to Dismiss (Doc. 9) is extended to **August 3, 2009.**

    Pursuant to NECivR 72.2, a party may appeal this order to the district judge by filing a "Statement of Appeal of Magistrate Judge's Order" no later than **May 21, 2009.** The filing of a statement of appeal will not stay this order pending appeal.  **Any requests for a stay shall be filed by separate motion at the time the appeal is filed.**

    **DATED May 14, 2009.**

                          **BY THE COURT:**

                           **s/ F.A. Gossett**
                           **United States Magistrate Judge**